1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    E.M.,                                   Case No.  20-cv-02272-JCS
                    Plaintiff,
8                                            **ORDER GRANTING IN PART AND**
          v.                                 **DENYING IN PART PLAINTIFF'S**
9                                            **MOTION FOR SUMMARY**
                                             **JUDGMENT AND GRANTING IN**
10   KILOLO KIJAKAZI,                        **PART AND DENYING IN PART**
                                             **DEFENDANT'S CROSS-MOTION FOR**
                    Defendant.               **SUMMARY JUDGMENT**
11
12                                           Re: Dkt. Nos. 32, 42

13

14   **I.      INTRODUCTION**

15        Plaintiff E.M.[1] received Supplemental Security Income ("SSI") based on disability as a

16   child pursuant to Title XVI of the Social Security Act ("the Act").  Pursuant to Section

17   1614(a)(3)(H) of the Act, after E.M. turned eighteen years-old, the Social Security Administration

18   ("SSA") redetermined E.M.'s eligibility for disability benefits under the rules for determining

19   disability in adults, Titles II and XVI of the Act.

20        On January 9, 2015, the SSA found that E.M. was no longer disabled.  The determination

21   was upheld upon reconsideration after a disability hearing by a state agency disability hearing

22   officer.  E.M. then requested a hearing before an administrative law judge ("ALJ"), which the ALJ

23   held on January 22, 2019.  On April 5, 2019, the ALJ concluded that E.M. was no longer disabled

24   as defined by the Act, and on February 11, 2020, the Appeals Council denied review of E.M.'s

25   appeal of the ALJ's decision, making it the final decision of the Defendant Commissioner of the

26   Social Security Administration ("Commissioner").

27   _____

28   [1] Because opinions by the Court are more widely available than other filings and this Order
     contains potentially sensitive medical information, this Order refers to Plaintiff using only his
     initials.

United States District Court
Northern District of California

After the Appeals Council denied review, E.M. sought review in this Court pursuant to 42 U.S.C. § 405(g).  Presently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART E.M.'s motion for summary judgment, GRANTS IN PART AND DENIES IN PART the Commissioner's cross-motion for summary judgment, and REMANDS for additional proceedings pursuant to the Court's order.[2]

## II.    REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A.    Redetermination of Child Disability

Section 1614(a)(3)(H) of the Act provides that individuals who are eligible for SSI benefits as children must have their disability redetermined under the rules for disability used for adults after they turn eighteen.  42 U.S.C. § 1382c(a)(3)(H)(iii).  When the SSA redetermines child disability after a claimant turns eighteen, the agency applies the standards for adult applicants, without deference to the prior disability finding and award of child's SSI.  *See* 20 C.F.R. § 416.987(a)-(b); Social Security Ruling 11-2p § IV(E)(2); *accord Pollard v. Berryhill*, 688 F. App'x 422 (9th Cir. 2017).  In other words, the SSA reviews the claimant as if he were a newly applying adult without deference to prior determinations.  *See Sabala v. Saul*, No. 1:19-CV-03683-DDD, 2020 WL 6946562, at *3 (D. Colo. Nov. 25, 2020) (citing 20 C.F.R. § 416.987(b)).

Section 1614(a)(3)(H) states that the medical improvement review standard, section 1614(a)(4), which is utilized in adult cases, does not apply to disability redeterminations at age eighteen.[3]  Accordingly, on redetermination of a child disability, an ALJ is *not* required to "compar[e] the current severity of the impairment with the severity of that impairment when

---

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

[3] In adult cases, the SSA may terminate benefits under certain circumstances if "there has been any medical improvement in the individual's impairment or combination of impairments," and "the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). "Medical improvement" is analyzed by comparing the current severity of the impairment with the severity of that impairment when claimant was last found to be disabled.  *See McCalmon v. Astrue*, 319 F. App'x 658, 659 (9th Cir. 2009) (citing 20 C.F.R. § 404.1594(b)(7)).

United States District Court
Northern District of California

1    claimant was last found to be disabled." 20 C.F.R. § 404.1594(b)(7).

2        **B.      Five-Step Framework**

3        Disability insurance benefits are available under the Act when an eligible claimant is

4    unable "to engage in any substantial gainful activity by reason of any medically determinable

5    physical or mental impairment . . . which has lasted or can be expected to last for a continuous

6    period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A

7    claimant is only found disabled if their physical or mental impairments are of such severity that

8    they are not only unable to do their previous work but also "cannot, considering [their] age,

9    education, and work experience, engage in any other kind of substantial gainful work which exists

10   in the national economy." 42 U.S.C. § 423(d)(2)(A).

11       The Commissioner has established a sequential, five-part evaluation process to determine

12   whether a claimant is disabled under the Act.  *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.

13   1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through

14   four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be

15   'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

16   steps." *Id.*

17       At step one, the ALJ typically considers whether the claimant is presently engaged in

18   "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).[4]  However, step one of the five-step

19   sequential evaluation process is not used for redetermining disability at age eighteen.  *See* 20

20   C.F.R. § 416.987(b).

21       At step two, the ALJ considers whether the claimant has "a severe medically determinable

22   physical or mental impairment" or combination of such impairments that meets the regulations'

23   twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment

24   or combination of impairments is severe if it "significantly limits [the claimant's] physical or

25   mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant does not have

26   a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ

27   _____

28   [4]The Court cites the regulations applicable to disability insurance benefits applications because the parallel SSI regulations are virtually identical.

United States District Court
Northern District of California

determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled. If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform. *Id.*

### C.    Supplemental Regulations for Determining Mental Disability

The SSA has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a. First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1).

Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled.  *See* 20 C.F.R. § 404.1520a(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at 12.00(A)(2)(b).  A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the

United States District Court
Northern District of California

1  claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

2  the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §

3  404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

4  sequential process [and] requires a more detailed assessment by itemizing various functions

5  contained in the broad categories found in paragraphs B and C of the adult mental disorders

6  listings in 12.00 of the Listing of Impairments . . . . "  SSR 96-8p, 1996 WL 374184, at *4.

7  **III.    BACKGROUND**

8       E.M. was born on December 6, 1994, and is currently twenty-seven years-old.

9  Administrative Record ("A.R.")  97.  He has always lived with his family, and has suffered from

10  borderline intellectual functioning, behavior problems, depression, anxiety, and schizophrenia

11  since early childhood.  *See id.* at 18, 96, 1071-84, 1102-15.

12       The SSA first found E.M. disabled as a child in 2011, based on a psychotic disorder and a

13  learning disorder.  *Id.* at 21, 101, 116.  E.M. turned eighteen years-old in 2012, and his benefits

14  ended on January 1, 2015, when the Commissioner redetermined that he was no longer disabled as

15  an adult.  *Id.* at 107.

16

17       **A.    Summary of Educational, Vocational, Intensive Home Treatment, Regional
             Center/Vocational Records**

18            **1.    Childhood Records (2002-2014)[5]**

19       In 2002, when E.M. was in the second grade, he was found to have "below average

20  cognitive ability, delays in adaptive behavior, daily living skills, socialization, and feelings of

21  depression." *Id.* at 398.  In April 2003, when E.M. was in third grade, he qualified for special

22  education services based on a learning disability.  *Id.*  He was suspended several times in

23  elementary school for threats and violent behavior against other children, and he subsequently

24  again qualified for special education services based on a "serious emotional disturbance." *Id.*  He

25  then attended special day treatment schools, the East Bay Agency for Children ("EBAC") and

26

27  _____

28  [5] The Commissioner disputes the relevance of the childhood records.  As discussed below in
   conjunction with E.M.'s pertinent claim, the Court concludes the records are relevant pursuant to
   Social Security Ruling 11-2p.

United States District Court
Northern District of California

Seneca Center, until he was homeschooled in eighth grade.  *Id.* at 399.

E.M. attempted to return to school toward the end of ninth grade, but he had difficulty focusing on academic work, and he made inappropriate and mean comments to other students.  *Id.* In tenth grade, he was accepted to the Children's Learning Center ("CLC") on a trial basis, but he was ultimately denied admission at the end of the trial period based on his insulting behavior toward other students.  *Id.*  He then returned to Seneca Center for tenth grade in 2010, where he "require[d] nearly one-on-one attention to complete any schoolwork."  *Id.*  At Seneca Center, E.M. continued to "exhibit impulsivity and severe difficulty staying on task for even brief periods."  *Id.* However, E.M. began taking medications that reduced his hallucinations.  *Id.*

In November 2010, E.M. was assessed by psychologists, Drs. Devin Prouty and Nitu Hans, following longstanding academic and behavioral difficulties.  *Id.* at 398.  Drs. Prouty and Hans completed a "comprehensive neuropsychological examination to assist with diagnostic clarification, treatment placement and assessment of current educational placement."  *Id.*

Drs. Prouty and Hans noted that E.M. had previously been assessed "many times since he was eight years-old," but that the results were often questionably valid due to E.M.'s "inconsistent effort and attention."  *Id.* at 411.  They further noted that E.M. had a "long history of severe deficits and impairments in adaptive functioning," first documented in the second grade.  *Id.*  Drs. Prouty and Hans found that E.M. suffered from "significantly subaverage intellectual functioning" that met the criteria for intellectual disability and was "expected to continue indefinitely."  *Id.* They found E.M. had an IQ score of 54.  *Id.*  The doctors recommended continuing medication, weekly psychotherapy, referral to a regional center to create an Individual Program Plan ("IPP"), therapeutic and possible in-home behavioral services, and possible housing options when E.M. grew older.  *Id.* at 412.

E.M. continued at Seneca Center through at least 2012.[6]  E.M. then attended Pathfinder Academy, where one of his teachers noted that E.M. was "unable to be in class often due to his

---

[6] E.M.'s Individual Education Program ("IEP") and school records for the period from 2010-2011 were included in the record before the ALJ but were not discussed by the ALJ below or in any detail by the parties before this Court.  A.R. 430-96.

negative behaviors toward his peers," and that he required one-on-one instruction and was able to do very little work independently. *See id.* at 326-28. E.M. subsequently moved to Boston, Massachusetts with his brother from 2013-2014, where he attended school and received services. *Id.* at 382.

E.M.'s February 2013 Individual Education Program ("IEP") noted his continued diagnosis of emotional disturbance and specific learning disability. *Id.* at 116;[7] *see also id.* at 568-70 (November 17, 2013 case analysis describing February 2013 IEP). The IEP stated that E.M.'s "emotional and learning needs impeded his ability to benefit from a general education setting. [E.M.] required specialized academic instruction in a structured setting which [could] address his learning, emotional and behavioral needs." *Id.* at 116.

Around the same time, a school psychologist from E.M.'s high school, Dr. Luna Malder, noted that E.M. had a history of "aggressive violence when he was younger, including choking another student and engaging in multiple fights." *Id.* at 765-66.[8] Dr. Malder requested that E.M. "receive an extra weapons check" in high school and reported that he "often picks on other students to put them down." *Id.*

Soon thereafter, in November 2013, when E.M. was eighteen years-old and living with his brother, E.T.M., in Boston, Massachusetts, an intensive home therapy program, Safe at Home, conducted an assessment and plan for E.M. *Id.* at 779-81. Clinician Hillary Pearlman, who appears to have been employed as a social worker for Safe at Home, found that E.M. required intensive home therapy meetings, school counseling, and medication management. *Id.* at 779. After several months, E.M.'s brother determined that Safe at Home was not a good fit for E.M. and, in March 2014, enlisted another intensive home therapy program, Home for Little Wanderers. *Id.* at 741.

E.M. received services from Home for Little Wanderers from March 2014 until August

---

[7] That IEP does not itself appear in the record before this Court. However, it was described in detail in the SSA disability hearing officer's August 2016 decision. A.R. 116.

[8] Dr. Malder's statements are contained in behavioral health assessment records obtained by an intensive home therapy program that E.M. subsequently attended.

United States District Court
Northern District of California

2014, when E.M. and his brother relocated from Boston back to California.  *Id*.  In April 2014, clinician Sarah Happel, a family therapist, completed a form questionnaire in which she found that E.M. possessed "marked" functional limitations in his ability to maintain satisfactory interpersonal relationships with teachers and peers.  *Id.* at 813.  Records from the Home for Little Wanderers demonstrated mixed results during E.M.'s treatment.  *See id.* at 748 (noting E.M. "improved his ability to communicate openly about thoughts and feelings," but that the "services did not yet have a chance to support [E.M.] in further exploring communication with peers due to early termination").

### 2.      Post-2014 Records

In April 2016, when E.M. was twenty-one years-old and living with his brother in Los Angeles, California, he attended school in the Los Angeles Unified School District ("LAUSD), where he had another IEP drawn up.  *Id.* at 382, 656-678.  He remained eligible for special education services and required special day programming.  *Id.* at 667, 671.  The IEP provided that E.M. would attend a transitional school for students until Fall 2016, when he would move to "Project Search at Kaiser Hospital."  *Id.* at 671.

The IEP included a functional assessment, noting that while E.M. was "able to do basic math operations" and he "recognize[d] and [knew] the value of coins he may encounter in his daily living," he could not "accurately tell how much change he should get back from bills greater than twenty dollars."  *Id.* at 656.  The plan further set a goal for E.M. that "by May 2017," he would learn how to accurately calculate a break schedule and be prompt in a work-like setting.  *Id.* at 660.

Around the same time, in April 2016,  E.M. also received independent living skills services from Solutions Plus, a community agency working with the South Central Regional Center in Los Angeles.  *Id.* at 382, 653.  E.M. received services from Solutions Plus through 2017, which included forty hours per month of supported living assistance, including help with "work preparation, cooking, home maintenance, personal hygiene, social development, mobility training, and medical care management."  *Id.* at 1040.  E.M. also participated in a vocational training program facilitated by the regional center and Solutions Plus, through which he was placed as a

United States District Court
Northern District of California

1   warehouse stock clerk at Kaiser Permanente.  *Id.*

2

3   In January 2017, two service coordinators from the Westside Regional Center met with

4   E.M. and E.M.'s brother to discuss E.M.'s progress in the vocational program.  *Id.* at 1040-44.  The

5   coordinators noted that E.M. needed to improve his hygiene, focus, and the accuracy and quality

6   of his work.  *Id.* at 1041.  They evaluated E.M., noting that he was "easily distracted while

7   working and require[d] multiple prompts to redirect his attention back to the immediate task at

8   hand."  *Id.*

9   In 2018, when he was twenty-three, E.M. returned to the San Francisco Bay Area and

10  qualified for regional center services there.  *Id.* at 1035-37.  The Regional Center of the East Bay

11  ("RCEB") subsequently evaluated him for an individual plan assessment and referred him to Adult

12  Enrichment Services.  *Id.* at 1035-37, 1086.  On March 23, 2018, Harpreet Kaur, a program

13  director for Adult Enrichment Services, assessed E.M.'s independent living skills in multiple

14  functional categories and made several findings.  *Id.* at 1086-90.

15  Ms. Kaur noted that E.M. required reminders about his hygiene, did not schedule or attend

16  medical appointments alone, did not clean without prompting and accompaniment, needed

17  assistance in counting change and money, was unable to access public transportation safely due to

18  the severity of his disability, and was "not entirely aware of his rights."  *Id.*  Her report noted that

19  E.M. was interested in working and that independent living services would help E.M. with his job

20  search and application process.  *Id.* at 1088-89.  Ms. Kaur prepared a suggested weekly schedule

21  for E.M. and recommended that he receive five hours per week of assistance with his daily

22  routine.  *Id.* at 1090.  Thereafter, beginning in August 2018, and with the assistance of RCEB,

23  E.M. received services from the Social Vocational Services in Newark, California, including

24  monthly job coaching, support, and supervision.  *Id.* at 1091.

25  ////

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### B.   Post-2012 Psychological/Psychiatric Treatment, Evaluations, and Testing Records[9]

The extensive record evidence regarding E.M.'s psychological and psychiatric treatment, testing, and evaluations spans a period of approximately five years from December 2013 (one year prior to the SSA's redetermination of E.M.'s childhood disability), through the date of the ALJ's decision below in January 2019.

#### *Dr. Ute Kollath*

In December 2013, when E.M. was eighteen years-old, psychologist Dr. Ute Kollath conducted an assessment for the SSA.  *Id.* at 563-67.  She administered several tests, including the WAIS-IV IQ test, on which E.M. received a score of 67.  *Id.* at 564.  Dr. Kollath questioned the validity of the IQ test results based on E.M.'s "limited engagement" during testing and opined that the results "underestimate[d] his level of functioning." *Id.* at 566.  Dr. Kollath also gave E.M. the Mini-Mental State Examination ("MMSE"), and E.M scored twenty-four out of thirty on the test, which, according to Dr. Kollath, was "fair."[10]  *Id.* at 564, 466.

Dr. Kollath also performed a psychological evaluation to identify E.M.'s mental limitations.  *Id.* at 22, 563-67.  She opined that his emotional domain was "impaired;" his functional domain was "impaired;" and his cognitive domain was "inconclusive."  *Id.* at 566-67.  She opined that he may have a neurocognitive disorder causing mild functional disruptions.  *Id.*  Regarding his work-related abilities, Dr. Kollath concluded that E.M. possessed mild impairments in terms of his ability to follow detailed instructions, to withstand the stress of a routine workday, and to adapt to changes, hazards, or stressors in the workplace.  *Id.* at 567.  She found that E.M. possessed moderate impairment in his ability to maintain an adequate pace or persistence to perform complex tasks.  *Id.*

---

[9] The limited childhood psychological records pertain primarily to E.M.'s education and qualification for special education services.  The Court previously discussed those records above in conjunction with E.M.'s childhood and education.

[10] The Mini-Mental State Examination ("MMSE") is "administered to screen current cognitive abilities. Scores range from 0-30, with higher scores indicating better cognitive functioning." Emalee J. W. Quickel & George J. Demakis, *The Independent Living Scales in Civil Competency Evaluations: Initial Findings and Prediction of Competency Adjudication*, 37 Law & Hum. Behav. 155, 158 (2013).

### *Didi Hirsh Mental Health Services*

Nearly a year after Dr. Kollath's evaluation, in November 2014, the Home for Little Wanderers referred E.M. to Didi Hirsch Mental Health Services ("Didi Hirsh) for psychotherapy and medication management upon E.M.'s return to California. *Id.* at 596-613, 828-993. E.M. was diagnosed with psychotic disorder and depressive disorders, and was treated at Didi Hirsh by Drs. Nick Gutierrez and Yelena Koldobskaya for approximately one year until November 2015. *Id.*

### *Dr. Banafshe Sharokhi's First Examination*

In December 2014, during the time that E.M. was treated at Didi Hirsh, Dr. Banafshe Sharokhi, an agency consultative examiner completed a psychological evaluation of E.M. *Id.* at 571-82. Dr. Sharokhi administered several psychometric tests during the examination, including the WAIS-IV IQ test, on which E.M. scored 63. *Id.* at 578. However, Dr. Sharokhi opined that the score, which was "within mild mental retardation, is clearly not an accurate representation of [E.M.'s] true cognitive abilities, per presentation and current functioning." *Id.* In support, the doctor found that E.M. had "exerted extremely inconsistent effort," and "impulsivity and carelessness." *Id.*

Dr. Sharokhi ultimately diagnosed E.M. with a mood disorder, but deferred a diagnosis regarding learning disorders, finding only that E.M.'s "cognitive ability falls within the probable borderline to low average intellectual functioning range." *Id.* at 580-81. He functionally assessed E.M. with a mild inability to carry out detailed instructions, to maintain attention, concentration, persistence and pace, and with mild limitations in his ability to maintain day-to-day activities. *Id.* at 581. Dr. Sharokhi found that E.M. was "essentially socially appropriate," and possessed only a mild inability to interact appropriately with supervisors, coworkers, and peers. *Id.*

### *Dr. Loomis*

Several months later, in January 2015, state agency non-examining medical consultant Dr. Loomis concluded that E.M. had no severe mental impairments. *Id.* at 583.

### *Dr. Kaely Shilakes*

On March 31, 2015, when E.M. was twenty years-old, psychologist Dr. Kaely Shilakes assessed E.M. to determine his levels of cognitive and adaptive functioning for the purpose of

12

United States District Court
Northern District of California

clarifying his diagnoses and determining his ongoing eligibility for regional center services.  *Id.* at

1071-84.  At the time of the examination, E.M. was attending twelfth grade at a high school in Los

Angeles, California.  *Id.* at 1074.  Dr. Shilakes interviewed E.M. and his brother, E.T.M., for

purposes of the assessment, and she also administered the Wechsler Adult Intelligence test and the

MMSE, among other tests.  *Id.*

E.M. received a score of 66 on the IQ test administered by Dr. Shilakes.  E.M. scored

twenty-nine out of thirty on the MMSE, which Dr. Shilakes opined suggested "normal cognitive

function."  *Id.* at 1077.  Dr. Shilakes noted that E.M. was "cooperative, attempted all testing tasks,

and appeared to try his best throughout."  *Id.* at 730.  Accordingly, she opined that the "[r]esults

are considered to be valid for the purposes of diagnoses and program planning."  *Id.*

The results of Dr. Shilakes' testing revealed that E.M. was "functioning overall in the

Mildly Delayed to Borderline range."  *Id.* at 1081.  He had mild deficits in overall adaptive

functioning, communication skills, and daily living skills.  *Id.* at 1080.  E.M. also possessed skills

that were significantly below grade level in reading, spelling, and math.  *Id.* at 1081.  Dr. Shilakes

opined that based on his cognitive processing, memory, and visual-motor skills, E.M. had "an age

equivalent of approximately 9 years, 7 months."  *Id.*  She further found that E.M. "present[ed] with

depressive and anxious symptoms," and that he had a history of psychotic symptoms.  *Id.*  She

ultimately opined that E.M. would benefit from continuing to participate in psychiatric services,

and that he may benefit from independent living skills and vocational training.  *Id.* at 1081-82.

### *Dr. Sharokhi's Second Evaluation*

In September 2015, following Dr. Shilakes' examination and assessment, state agency

consultative examiner completed a second psychological evaluation of E.M. nine months after his

first December 2014 evaluation.  *Id.* at 623-33.  During the second evaluation, Dr. Sharokhi

administered testing identical to that conducted at E.M.'s first evaluation.  *Id.*  As he did with the

first examination, Dr. Sharokhi again found that E.M. suffered from depression and anxious mood,

dysphoric affect, psychomotor retardation, impaired immediate memory, moderate distractibility,

below average fund of knowledge, distractible thought processes, and fair insight and judgment.

*Id.* at 575-77, 627-29.

United States District Court
Northern District of California

1     E.M. scored lower on Dr. Sharokhi's IQ test in 2015, with a score of 59 (as compared to 63

2  in 2014).  *Id.* at 578, 630.  The test results were again in the "extremely low," range, but Dr.

3  Sharokhi once again opined that the test was not an accurate representation of E.M.'s true

4  cognitive abilities, which he placed in the borderline or low average range.  *Id.* at 630-31.  Dr.

5  Sharokhi again acknowledged problems with E.M.'s testing efforts and opined that E.M.'s effort

6  was "fair" because he displayed carelessness and aborted subtests prematurely.  *Id.* at 630.

7     Dr. Sharokhi's September 2015 functional assessment was similar to his December 2014

8  functional assessment.  *Id.* at 632.  However, in 2015, Dr. Sharokhi opined that E.M. possessed a

9  moderate – as opposed to mild – limitation in his ability to maintain attention, concentration, and

10  pace.  *Id.*

11     ***Enki Health***

12     In November 2015, when he was twenty years-old, E.M. moved his psychiatric care from

13  Didi Hirsh to Enki Health.  *Id.* at 683.  E.M. was treated by several different physicians and

14  clinicians at Enki Health through 2017, until he relocated back to the Bay Area.  *Id.* at 682-706,

15  1008-32.  Upon intake at Enki Health, the social worker noted that E.M. was "easily angered,

16  irritable, [and] paranoid," suffered from auditory and visual hallucinations, and had a "depressed

17  mood, fatigue, [and] low self-esteem."  *Id.* at 702.  E.M. reported to Enki clinicians that he felt "as

18  though he had a lot of enemies," and "[p]eople are his enemies if they are very rude to him."  *Id.* at

19  1024.  He stated that "in his dreams he hurts these people by burning them," and that "if he were

20  rich[,] he would attempt this."  *Id.*  Enki Health physicians diagnosed E.M. with psychosis.  *Id.* at

21  702.

22     ***Dr. Singh***

23     In January 2016, during the time that E.M. was receiving treatment at Enki Health, non-

24  examining state agency consultant, Dr. Singh, reviewed E.M.'s records and assessed E.M.'s RFC.

25  *Id.* at 634-36.  Dr. Singh explicitly noted agreement with state agency consultant, Dr. Loomis'

26  January 2015 psychological assessment, in which Dr. Loomis found that E.M. had no severe

27  impairments.  *Id.* at 635.

28     Dr. Singh ultimately concluded that E.M. could perform work limited to non-public,

simple, repetitive tasks. *Id.* at 636. He found no limitations on E.M.'s ability to understand, remember and carry out short, simple instructions or in his ability to accept instructions from supervisors. *Id*. He also concluded that E.M. did not require special supervision for simple tasks. *Id.*

### Dr. Patrick O'Reilly

In 2018, psychologist Dr. Patrick O'Reilly met with E.M. nine times for the purpose of "provid[ing] pscyho-education to [E.M.] regarding the importance of medication compliance, to teach problem-solving skills related to social interaction, and to encourage him to enroll in programs, specifically day treatment programs that would afford him the opportunity to interact socially with others and to potentially make friends." *Id.* at 1064. Dr. O'Reilly diagnosed E.M. with schizophrenia and borderline intellectual functioning and opined that E.M. would do well in a day treatment plan. *Id.* E.M. chose to discontinue psychotherapy with Dr. O'Reilly, and the doctor noted "mixed results." *Id.* During his psychotherapy, E.M. told Dr. O'Reilly that "he'd lost his job because he had too often not shown up for work and that he had tentatively been hired to work at a better paying job." *Id.*

### Dr. Lara San Pedro

On January 11, 2019, psychologist Dr. Lara San Pedro conducted a psychological evaluation of E.M., during which she interviewed E.M., his mother, and his sister, and administered several tests. *Id.* at 1102-15. She diagnosed E.M. with moderate intellectual disability, major depressive disorder with psychotic features, generalized anxiety disorder, autism spectrum disorder (level one, requiring support with intellectual impairment), and unspecified schizophrenia and other psychotic disorder. *Id.* at 25, 1112.

Dr. San Pedro administered an IQ test and found that E.M. had a score of 69, which placed him in the extremely low range in all cognitive areas – verbal comprehension, perceptual reasoning, working memory, and processing speed. *Id.* at 1106. Another neuropsychological test revealed that E.M. had significantly impaired neurocognitive function. *Id.* at 1108. An autism test revealed that E.M. had "abnormal speech, odd nonverbal gestures, abnormal eye contact, repetitive and restricted speech, restricted affect, dramatic hand gestures, [and] depressed and anxious

United States District Court
Northern District of California

1   mood." *Id.* at 1109-10.

2        Finally, Dr. San Pedro administered a functioning assessment test, which demonstrated

3   that E.M. possessed extremely low functioning in all three areas, including communication, daily

4   living skills, and social-emotional skills. *Id.* at 1110-11. Dr. San Pedro elaborated as follows

5   regarding E.M.'s functional capacity:

6

7        Considering adaptive abilities, [E.M.] has significant functional limitations . . . . He
         needs support with daily activities and fund management. Activities such as
8        remembering and completing important skilled work tasks and managing symptoms
         are impaired. [E.M's] symptoms make it difficult to remember instructions,
9        procedures, rules and task lists, and complete tasks in an accurate and timely manner.
         [E.M.'s] psychological symptoms would likely impact his attendance, greatly limit
10       his performance, as avolition is part of his course of symptomology. His poverty of
         thought, poor performance, depression, anxiety, and awkward social communication
11       skills and behaviors may cause relationship problems with peers and authorities.

12
    *Id.* at 1113.
13

14       Ultimately, Dr. San Pedro opined that in terms of E.M.'s RFC, he was moderately limited

15  in his ability to "understand, remember, and carry out very short and simple instructions," and in

16  his ability to maintain attention and concentration for two-hour periods. *Id.* at 1115. He possessed

17  "marked" limitations in his ability to understand, remember, and carry out detailed instructions;

18  perform at a consistent pace without an unreasonable number and length of rest periods; get along

19  and work with others; and interact appropriately with the general public. *Id.* In the remaining four

20  categories, E.M. suffered from extreme limitations, including his ability to: (1) accept instructions

21  and respond appropriately to criticism from supervisors; (2) respond appropriately to changes in a

22  routine work setting and deal with normal work stressors; (3) complete a normal workday and

23  workweek without interruptions from psychologically-based symptoms; and (4) maintain regular

24  attendance and be punctual within customary, usually strict tolerances. *Id.*

25       **C.     E.M.'s Testimony**

26       At the January 22, 2019 hearing, in terms of his hygiene, E.M. testified that he can bathe,

27  shower, and dress himself, but that he needs reminders from his mother, brother, and/or sister to

28  do all of those things. *Id.* at 44-45. He admitted that he does not brush his teeth very often. *Id.* at

United States District Court
Northern District of California

16

45.

E.M. can use the microwave, but, other than that, he does not cook for himself, and he does not know how to use the stovetop.  *Id.* at 46.  E.M. receives a daily allowance because otherwise he will spend the money.  *Id.* at 46-47.  He likes to eat out at a pizza shop near his house by himself, but he walks there because he does not drive.  *Id.* at 47.  When he goes places, E.M.'s sister, F.M., [11] helps him schedule a Lyft and she provides the credit card for his Lyft, but E.M. can ride in the Lyft alone.  *Id.* at 48-49.  E.M. often pays for purchases with a credit card because he does not really know how to make change.  *Id.* at  50.

In terms of his regular routine, E.M. needs help remembering to do chores.  *Id.*  He testified that he gets "frustrated" and feels "lazy" and "depressed" sometime when family members ask him to help.  *Id.* at 52.  He hits his head on the wall when he gets angry.  *Id.* at 54.  That sometimes happens when he forgets to take his medications.  *Id.*

A family member gives E.M. his medications and watches him take them.  *Id.* at 55. Despite the medications, he experiences ongoing auditory and visual hallucinations when he is alone.  *Id.* at 61-64.

E.M. is not allowed to carry a key to his home for fear he will lose it.  *Id.* at 61.

Regarding his work history, E.M. stated that he had worked at Costco's "front end" and bakery and at Safeway "running carts."  *Id.* at 64.  He quit his job at Safeway because the customers "were mean" to him.  *Id.* at 66.  At the time of the 2019 hearing, E.M. was working at Amazon part-time, where he scanned boxes.  *Id.* at 67-68.

**D.    Testimony from E.M.'s Family Members**

**1.    Sister's Testimony**

E.M.'s sister, F.M., who works as a nurse, submitted a sworn declaration in advance of E.M.'s hearing.  *Id.* at 384-85.  She attested that she resided with E.M. at the time of the hearing and that she had resided with him much of his life.  *Id.* at 384.

F.M. described how E.M. requires reminders regarding hygiene and chores.  *Id.* at 384-85.

---

[11] Because this Order contains potentially sensitive medical information, this Order refers to E.M.'s brother, E.T.M., and sister, F.M., by their initials as well.

United States District Court
Northern District of California

She also described E.M.'s inability to calculate change, his problems with focus, and his need for supervision.  *Id.*  She further recounted E.M.'s prior angry outbursts and noted that he was prone to such outbursts at least twice per month.  *Id.*

### 2.    Brother's Testimony

E.M.'s brother, E.T.M., a practicing clinical psychologist, also lived with and cared for E.M. for several years while E.T.M. was completing advanced degrees in Boston, Massachusetts, and Los Angeles, California.  *Id.* at 382.  The family decided that E.M. should live with E.T.M. because he "could serve as an informed and effective resource to navigate systems in order for [E.M.] to access the care and services he need[ed]."  *Id.*

E.T.M. attested that E.M. never graduated from high school and described past services that E.M. received geared toward students with moderate to severe disabilities.  *Id.*  E.T.M. accompanied E.M. to two psychological consultative evaluations in December 2014 and September 2015.[12]  E.T.M. notes that each of the evaluations lasted approximately fifty minutes, and opines, as a licensed psychologist, that it would have been impossible for Dr. Sharokhi to "develop the necessary rapport with [E.M.], or complete the testing involved in the time allotted," and that "therefore[,] the results would be invalid."  *Id.*

### E.    The ALJ's Decision

The ALJ ultimately determined that E.M. was not disabled at step five of the disability determination.  *Id.* at 33.  Because step one, the determination regarding substantial gainful employment, is not utilized for redetermining disability at age eighteen, the ALJ commenced the inquiry at step two.  *Id.* at 18.  She determined that E.M.'s depression, anxiety, schizophrenia, and learning disorder/borderline intellectual functioning constituted severe impairments.  *Id.*

At step three, the ALJ found that E.M.'s impairments, even in combination, did not meet or equal in severity any of the listed impairments, and specifically considered Listings 12.04 (depressive disorders), 12.05 (intellectual disability), and 12.06 (anxiety and obsessive-compulsive

---

[12] E.T.M. presumably references Dr. Sharokhi's initial December 2014 psychological evaluation, A.R. 571-82, and Dr. Sharokhi's subsequent September 2015 psychological evaluation.  *Id.* at 623-33.

United States District Court
Northern District of California

disorders). *Id.* at 18-21.  In making this determination, the ALJ addressed whether the paragraph B criteria of these listings were satisfied. *Id.* at 19-20.  The ALJ found that E.M. had moderate limitations in three of the four functional categories of paragraph B, including his ability to understand, remember, or apply information, his ability to concentrate, persist, or maintain pace, and his ability to interact with others. *Id.* at 18-19.  By contrast, the ALJ determined that E.M. possessed only a mild limitation in terms of his ability to adapt and/or manage himself. *Id.* at 19.  The ALJ thus concluded that E.M. did not meet the paragraph B criteria because he did not have two marked limitations or one extreme limitation in the functional categories. *Id.* .

The ALJ further found that E.M. did not meet the paragraph C criteria, either. *Id.*  Finally, regarding paragraph A, the ALJ found that the requirements were not met because E.M. "demonstrated the ability to participate in testing with Drs. Kollath, Sharokhi, and Shilakes." *Id.* at 20.

At step four, the ALJ found that, since January 1, 2015, E.M. had the residual functional capacity ("RFC") to perform:

> a full range of work at all exertional levels.  Mentally, [E.M.] can understand, remember and perform simple, routine and repetitive tasks involving simple, work-related decisions, with few if any, workplace changes.  He can tolerate occasional interaction with supervisors and coworkers and brief, incidental contact with the public.  In addition, [E.M.] may be off task up to five percent of the workday, but would not consistently be off task five percent of every workday.

*Id.*  In reaching this RFC, the ALJ found that E.M.'s medically determinable impairments could reasonably cause the symptoms he alleged, but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 22.

The ALJ explained that she afforded "great weight" to the RFC opinion of non-examining state agency consultant, Dr. Singh, because she found that it was "well-supported by the longitudinal record, illustrating behavioral difficulties as a child but improved functioning with therapy and medication." *Id.* at 25.  The ALJ then afforded "partial weight" to state agency examining physicians, Drs. Kollath and Sharokhi, concluding that "mild to moderate limitations"

were "consistent with their clinical findings and the underlying record." *Id.* However, regarding

their opinions that E.M. be limited to light work, the ALJ found that additional social limitations

were needed. *Id.*

The ALJ gave "little weight" to the opinions of non-examining state agency psychiatrist,

Dr. Loomis, and to examining psychologist, Dr. San Pedro. *Id.* at 25-26. Regarding Dr. Loomis,

the ALJ noted that he "did not have the opportunity to review many new records available at the

hearing level, which confirm[ed] ongoing severe impairment." *Id.* at 25. The ALJ afforded little

weight to Dr. San Pedro's opinion, asserting that her conclusions were at odds with E.M.'s

demonstrated work activity and that she relied on erroneous information. *Id.* at 25-26. The ALJ

also afforded "limited weight" to the lay testimony of E.M.'s sister and brother. *Id.* at 26.

The ALJ failed to ascribe any weight to the opinions of the Didi Hirsh or Enki Health

medical providers, Dr. Shilakes, or Dr. Patrick O'Reilly. *See id.* (discussing weight afforded to

opinions).

The ALJ also explicitly addressed E.M.'s global assessment of functioning test scores.[17]

She gave "great weight" to scores reflecting moderate mental limitation, reasoning that they were

"consistent with the reports from Drs. Kollath, Sharokhi, and Shilakes, and treatment records

showing good response to medication when compliant." *Id.* By contrast, the ALJ afforded little

weight to GAF scores in the serious range because they were inconsistent with clinical findings

and E.M.'s own work history since 2017. *Id.*

At step four, the ALJ found that E.M. had no past relevant work. *Id.*

---

[17] The GAF is a scale "ranging from zero to 100, used to rate social, occupational and
psychological functioning on a hypothetical continuum of mental health." Carolyn A. Kubitschek
& Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 5:30 (Feb.
2022).

> It is a subjective rating of an individual's overall psychological functioning, which
> may assist an ALJ in assessing a claimant's mental RFC. While a GAF score may
> help an ALJ assess mental residual functional capacity, it is not raw medical data.
> As such, a GAF score, although not determinative, may assist an ALJ in assessing
> a claimant's mental RFC. The GAF score is a subjective determination that
> represents the clinician's judgment of the individual's overall level of functioning.

*Id.* (quotations omitted).

United States District Court
Northern District of California

At step five, the ALJ relied on the testimony of a vocational expert ("VE") in concluding that E.M. could perform a limited range of work at all exertional levels in light of his nonexertional limitations, including as a cleaner, laundry worker, or housekeeper.  *Id.* at 27.  The ALJ thus found E.M. not disabled at step five.  *Id.*

## IV.     ISSUES FOR REVIEW

E.M. seeks reversal of the Commissioner's denial of benefits for seven reasons, arguing that:

(1)     the ALJ erred by failing to obtain medical expert testimony to resolve inconsistencies in E.M.'s IQ testing;

(2)     the ALJ erred in ignoring and/or rejecting relevant findings and opinions in E.M.'s special education, intensive home treatment, and regional center/vocational program records, including those from Sarah Happel, Hillary Pearlman, and Harpreet Kaur; [18]

(3)     the ALJ erred in rejecting the opinions of E.M.'s treating and examining physicians, including opinions from:

      a.     treating clinician, Dr. Patrick O'Reilly;

      b.     examining psychologist, Dr. Kaely Shilakes; and

      c.     examining psychologist, Dr. Lara San Pedro.

(4)     the ALJ improperly rejected E.M.'s testimony without providing clear and convincing reasons for doing so;

(5)     the ALJ improperly rejected statements from E.M.'s sister and brother without providing germane reasons for doing so;

(6)     the ALJ improperly assessed E.M.'s RFC; and

(7)     the ALJ's appointment violates the Appointments Clause of the United States Constitution.

---

[18] As discussed in more detail below, E.M. originally labeled this claim as one pertaining to the rejection of medical source opinions, which it is not.  Accordingly, the Court has addressed this claim, which primarily concerns non-medical source findings and opinions, separately from E.M.'s claim regarding the medical source opinions.

United States District Court
Northern District of California

1

2    **V.    DISCUSSION**

3        **A.    Standard of Review**

4        District courts have jurisdiction to review the final decisions of the Commissioner and may

5    affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

6    hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).  "This court may set aside the

7    Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

8    error or are not supported by substantial evidence in the record as a whole."  *Tackett*, 180 F.3d at

9    1097.  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to

10   support a conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389,

11   401 (1971).  "'Substantial evidence' means more than a mere scintilla," *id*., but "less than

12   preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

13   1988) (internal citation omitted).  Even if the Commissioner's findings are supported by

14   substantial evidence, the decision should be set aside if proper legal standards were not applied

15   when weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In

16   reviewing the record, the Court must consider both the evidence that supports and the evidence

17   that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

18   1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

        **B.    Failure to Obtain Medical Expert Testimony re IQ Testing**

19       E.M. contends that the ALJ's failure to call a medical examiner ("ME") and reconcile the

20   validity of the IQ tests conducted by four different evaluating psychologists resulted in the ALJ's

21   error in determining whether he met or equaled Listing 12.05 and in an incomplete RFC

22   determination.  In support, E.M. notes that two of the administering doctors, Drs. Kollath and

23   Sharokhi, questioned the validity of the test results, and that his brother, a psychologist, also

24   questioned the validity of Dr. Sharokhi's IQ tests.[19]  *See* A.R. 26, 382, 564, 566, 579, 630.  E.M.

25   argues that the Commissioner's Hearings, Appeals, and Litigation Manual ("HALLEX") imposed

26   a duty on the ALJ to obtain medical expert testimony because there was a question about the

27

28   _____

[19] By contrast, Drs. San Pedro and Shilakes opined that their testing was "adequate" and "valid," respectively.  A.R. 1105-06, 730-31.

accuracy of the medical test results reported.  The Commissioner counters that the ALJ was not required to call an ME because the validity – as opposed to the accuracy – of the tests was questioned.

### 1.    Legal Standards

Normally, the Social Security Act obligates claimants to furnish medical evidence proving the existence of a disability.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512.  However, "[t]he ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  Nevertheless, it is ultimately the plaintiff's duty to prove that he or she is disabled. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001).  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Id.* at 459-60.

When determining if a plaintiff is disabled based on an intellectual disability, "IQ scores are relied upon for the purpose of assessing that disability, [and] there is no question that a 'fully and fairly developed' record will include a complete set of IQ scores that report verbal, non-verbal, and full-scale abilities." *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930-31 (9th Cir. 2014) (citation omitted).  "This is true for two reasons[:] first, IQ scores help identify intellectual disability, can be dispositive of disability under the listing, and can affect other evidence in the record such as medical opinions." *Sandra M. G. M. v. Berryhill*, No. CV 18-0543-KS, 2019 WL 1755422, at *7 (C.D. Cal. Apr. 19, 2019) (citing *Garcia*, 768 F.3d at 931).  "Second, 'the regulations promulgated by the SSA demonstrate that the Administration, based on its considerable expertise, has determined that it is essential for . . . IQ scores to be used in evaluating intellectual disability.'"  *Id.* (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(D)(6)(b)) ("[S]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability, except where a claimant is unable to complete such testing.").

In *Garcia*, the plaintiff had only a partial set of IQ scores, and the Ninth Circuit found the ALJ committed legal error in failing to fully develop the record so that it included a full set of IQ scores for the plaintiff.  768 F.3d at 930, 932.  There, a psychologist had administered the WAIS-

United States District Court
Northern District of California

III exam, which measures an individual's IQ based on three scores: verbal, performance, and full scale. *Id.* at 927. The psychologist, however, administered only the performance portion of the WAIS-III due to time constraints and how slowly the plaintiff worked. *Id.* Thus, the psychologist did not report a verbal or full-scale IQ score, and instead provided only the performance IQ score. *Id.* Based on the incomplete IQ test results, a second psychologist and a physician both opined that the plaintiff was moderately limited. *Id.* at 928.

The Ninth Circuit concluded that "[i]t was legal error for the ALJ not to ensure that the record included a complete set of IQ test results that both the ALJ and the reviewing experts could consider." *Id.* at 929. The Ninth Circuit explained that "where the case turned on whether the claimant had an intellectual disability and IQ scores were relied upon for the purpose of assessing disability, a fully and fairly-developed record had to include a complete set of IQ scores that reported verbal, non-verbal, and full-scale abilities." *King v. Berryhill*, No. 16-CV-06643-KAW, 2018 WL 1367342, at *7–8 (N.D. Cal. Mar. 16, 2018) (discussing *Garcia*, 768 F.3d at 930-31).

### 2.   Analysis

Here, unlike *Garcia,* the record contains multiple *complete* IQ test results. E.M.'s scores on the five IQ tests ranged from 59-69. *See* A.R. 564 (score of 67 pursuant to test administered in December 2013 by Dr. Kollath); *id.* at 578 (score of 63 pursuant to test administered December 2014 by Dr. Sharokhi); *id.* at 630 (score of 59 pursuant to test administered September 2015 by Dr. Sharokhi); *id.* at 730 (score of 66 pursuant to test administered March 2015 by Dr. Shilakes); *id.* at 1106 (score of 69 pursuant to test administered January 2019 by Dr. San Pedro).

To the extent that the IQ test results were unreliable, that unreliability stemmed from E.M.'s inconsistent effort, and the record reveals that multiple evaluators expressed concern regarding E.M.'s effort and concentration on such tests since his childhood.   There is nothing to suggest that the administration of an additional sixth IQ test by an ME would have altered this phenomenon or have improved upon the reliability of E.M.'s test results.

Furthermore, the Commissioner's litigation manual, HALLEX, does not change this result because, as recognized by the Ninth Circuit, the manual does not impose judicially enforceable duties on either the ALJ or this Court. *See Lockwood v. Comm'r Social Sec. Admin.*, 616 F.3d 1068, 1072 (9th Cir. 2010) (concluding that HALLEX is an internal policy manual); *Dixon v.*

*Saul*, 411 F. Supp. 3d 837, 853-54 (N.D. Cal. 2019) (ALJ did not have a duty to obtain medical examiner testimony pursuant to HALLEX); *accord Lloyd v. Astrue*, No. C-11-4902 EMC, 2013 WL 503389, at *4 (N.D. Cal. Feb. 8, 2013).

Because the ALJ's findings here were based "*not* on an incomplete set of IQ test results, but a rejection of those test results as being tainted by [E.M.'s] actions during the testing itself," the Court concludes that the ALJ was not required to send E.M. to an ME for additional testing pursuant to *Garcia* or her duty to develop the record.  *King*, 2018 WL 1367342, at *7-8 (holding that ALJ was not required to send the plaintiff out for additional testing where the IQ test results were complete but tainted by plaintiff's malingering during the test).

**C.      ALJ's Rejection of Special Education, Intensive Home Treatment, and Regional Center Records**

With a few, limited exceptions, the ALJ largely ignored the bulk of the record evidence regarding E.M.'s special education, intensive home treatment, and regional center records – both from E.M.'s childhood and post-2014.  *See supra* Order at sections III(A)(1) and (2).  E.M. argues that the ALJ erred in doing so pursuant to Social Security Ruling ("SSR") 11-2p.[20]

**1.      Social Security Ruling 11-2p**

The SSA has promulgated specific guidance with respect to the evaluation of disability in young adults, whom it defines as "people between the ages of 18 to approximately 25." SSR 11-2p, 2011 WL 4055665, at *1 (Sept. 12, 2011).  Because E.M. was twenty years-old at the time the Commissioner redetermined his benefits in January 2015, SSR 11-2p applies to his case.

"The abilities, skills, and behaviors that young adults use to do basic work activities are the

---

[20] As noted, E.M. mistakenly categorized the three claims as treating medical source claims and addressed them with his other claims related to the ALJ's rejection of medical opinions.  However, for the most part, and as discussed below in detail, the three claims are in fact much broader than that.  They are more appropriately considered together in conjunction with the ALJ's rejection of evidence made relevant by Social Security Ruling 11-2p, governing the ALJ's duties in documenting and evaluating disability in young adults.  *See* 2011 WL 4055665.  With a few exceptions, the vast majority of findings and opinions in the special education, intensive home treatment, and regional center records are *not* from acceptable medical opinions, but instead constitute findings and opinions from non-medical sources that SSR 11-2p expressly makes relevant to these proceedings.

United States District Court
Northern District of California

same as those that older adolescents use for age-appropriate activities." SSR 11-2p, 2011 WL 4055665 at *2. Therefore, the evidence an ALJ considers in making a disability determination for a young adult "is generally the same as, or similar to," evidence an ALJ considers in making determinations for older adolescents. *Id.* Social Security Ruling 11-2p instructs ALJs to consider evidence from other sources who are not medical sources, "but who know and have contact with the young adult [and] can help [the ALJ] evaluate the severity and impact of a young adult's impairment(s)." 2011 WL 4055665 at *5. The ruling provides examples of such non-medical sources, including "family members or educational personnel (for example, teachers and counselors), public and private social welfare agency personnel, and others (for example, friends, neighbors, and clergy)." *Id.*; *see also Hindsman v. Berryhill*, No. 17-3612, 2018 WL 4568598, at *11 (E.D. Pa. Sept. 24, 2018) (ALJ will consider all evidence relevant to disability determination, including school records)*; Samuel v. Comm'r of Soc. Sec.*, No. 14-CV-4634 PKC, 2015 WL 5774850, at *13 (E.D.N.Y. Sept. 30, 2015) (quoting SSR 11-2p, 2011 WL 4055665 at *5). The ALJ is required to consider "evidence in the case record from non-medical sources when [the ALJ] determine[s] the severity of the young adult's impairment(s) and how the young adult is able to function." SSR 11-2p, 2011 WL 4055665 at *5.

According to SSR 11-2p, relevant considerations in evaluating a young adult's impairment-related limitations include evidence regarding functioning from:  (1) educational programs; (2) community experiences, including job placements; (3) psychosocial supports and highly structured or supportive settings; (4) extra help and accommodations; and (5) work-related stress.  2011 WL 4055665 at *6-10.  Evidence that a claimant has difficulties in the above areas does "not necessarily establish that a young adult is disabled, only that the person may have limitations that affect what work he or she may be able to do." *Id.* at *7.

SSR 11-2p is binding on ALJs.  *See Heckler v. Edwards*, 465 U.S. 870, 873 n. 3 (1984) (Social Security Rulings are binding on all SSA decisionmakers); *Bray v. Comm'r Soc. Sec.*

*Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (holding that Social Security Rulings "do not carry the 'force of law,' but they are binding on ALJs nonetheless"); *see also Ka'deef M. v. Comm'r of Soc. Sec.*, No. 3:20-CV-787 (DJS), 2021 WL 2952801, at *5–6 (N.D.N.Y. July 14, 2021) (same); *Barrios v. Colvin*, 2016 WL 756457, at *7 (C.D. Cal. Feb. 24, 2016) (remanding for further administrative proceedings to conduct the analysis required by SSR 11–2p); *Samuel v. Comm'r of Soc. Sec.*, 2015 WL 5774850, at *13 (remanding where ALJ failed to review school records, including school psychologist records, in conflict with SSR 11-2p).

## 2.    Special Education Records

### a.    Legal Standards

SSR 11-2p specifically identifies four categories of educational evidence that could assist an ALJ in determining a young adult's functioning, including: (1) evidence concerning whether the young adult received special education and related services; (2) evidence pertaining to any individualized education program ("IEP") formulated for the young adult, describing the skills they needed to develop; (3) evidence pertaining to IEP transition goals, whether transitioning to supervised and supported work and living settings, or independent ones; and (4) considerations related to the fact that goals contained in an IEP may be set at an achievable level to foster a sense of accomplishment, and "may be lower than what would be expected of a young adult without impairments." 2011 WL 4055665 (2021) *10-13.

Young adults receiving special education services will have an IEP, which provides details on a young adult's functioning in school programs, including how well the person can use their physical or mental abilities to perform work activities. *Kristy M. P v. Saul.*, No. 19-CV-00749-TSH, 2020 WL 5760476, at *9 (N.D. Cal. Sept. 27, 2020) (citing SSR 11-2p, 2011 WL 4055665, at *7-8). Certain "school-reported difficulties," might portend difficulty with work activities, including:

> [d]ifficulty in understanding, remembering, and carrying out simple instructions and work procedures during a school-sponsored work experience; [d]ifficulty communicating spontaneously and appropriately in the classroom; [d]ifficulty with

maintaining attention for extended periods in a classroom; [d]ifficulty relating to authority figures and responding appropriately to correction or criticism during school or a work-study experience; [and] [d]ifficulty using motor skills to move from one classroom to another.

*Id*. at *7.

### b.     Analysis

E.M. claims that the ALJ erred by rejecting the findings and opinions contained within his special education records.  In conjunction with his argument that the ALJ generally failed to consider his special education records, E.M. points to several records in particular, including:  (1) his high school counselor's notes regarding his aggressive and violent behavior, A.R. 766, 738-814; (2) the LAUSD's decision to renew his IEP in 2015 when he was twenty-one, *id.* at 667, 671, 656;  and (3) his 2016 IEP's finding that he needed assistance with vocational skills,  *id.* at 660, 662, 673-74.[21]

The Commissioner does not dispute that the ALJ failed to consider the special education records, but instead counters that evidence of E.M.'s childhood disability was irrelevant such that the ALJ was not required to analyze E.M.'s special education records in-depth.  *See* Def.'s Cross-Mot. for Summ. J. at 14.   The Commissioner contends that the relevant period in this adult case was from January 1, 2015, the date that the SSA found that E.M. was no longer disabled, until January 22, 2019, the date of the hearing before the ALJ.

Other than to acknowledge that E.M. "was in a special education curriculum in high school and received a certificate of completion" the ALJ did not address any of E.M.'s special education records, including his need to attend special day schools and to revert to homeschool because of his mental impairments and learning disorders, or any of E.M.'s IEPs (including those from 2010, 2013, and 2016).  A.R. 22.  The ALJ also did not address the evidence specifically noted above by E.M.

Notably, the ALJ also failed to mention SSR 11-2p in her decision, which applied to these

---

[21] E.M. also mentions an April 14, 2014 finding from Home for Little Wanderers clinician Sarah Happel that E.M. had a "marked" inability to maintain satisfactory interpersonal relationships with peers and teachers.  A.R. 810-813.  Because this record is an intensive home treatment record, it is addressed with those records below.

proceedings – a redetermination of child disability benefits – because E.M. was a young adult. Contrary to the Commissioner's argument otherwise, E.M.'s special education records -- even those that predated January 1, 2015, the date that the SSA found that E.M. was no longer disabled -- were relevant pursuant to SSR 11-2p.[22]  *See* SSR 11-2p, 2011 WL 4055665, at *5 n. 19 (emphasis added) (noting that "'special education' refers to instructional services provided to students through age 21 in *primary and secondary* education under the Individuals with Disabilities Education Improvement Act of 2004").

The Court acknowledges that the ALJ was not required to discuss each opinion and/or finding in E.M.'s special education records on an individualized statement-by-statement basis.  *See Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012), *superseded by regulation on other grounds* (holding that ALJ need not "discuss every witness's testimony on a[n] individualized, witness-by-witness basis," but is permitted to "give germane reasons for rejecting testimony by one witness [and then] need only point to those reasons when rejecting similar testimony by a different witness").  However, the ALJ's apparent rejection of this entire category of evidence disregarded SSR 11-2p.  E.M.'s school records documented a lengthy history of emotional disturbance, physical aggression, and learning disorders, which "would appear directly relevant to the ALJ's inquiry into Plaintiff's ability to maintain attention and concentration, meet attendance requirements, and interact with supervisors, co-workers, and the general public."  *Ka'deef M. v. Comm'r of Soc. Sec.*, 2021 WL 2952801, at *5-6; *see also Kristy M. P.*, 2020 WL 5760476, at *9. For these reasons, the ALJ erred in rejecting the special education records, including the three records specifically mentioned by E.M. and set forth above.

### 3.    Intensive Home Treatment and Regional Center Records

#### a.    Legal Standards

As discussed above, in addition to school records, Social Security Ruling 11-2p also

---

[22] The same is the case with E.M.'s intensive home treatment and regional center records addressed below.  Moreover, the Court notes that, contrary to the Commissioner's argument, the ALJ did *not* limit her consideration of other evidence that predated January 1, 2015. For example, the ALJ considered state agency consulting physicians, Drs. Kollath's and Sharokhi's opinions from December 2013 and December 2014, respectively.  *See* A.R. 25 (giving "partial weight" to both).

requires an ALJ to consider community experiences, including job placements, psychosocial

supports and highly structured or supportive settings, and extra help and accommodations.  2011

WL 4055665 at *6–10.  Again, the ruling directs ALJs to consider evidence from "other sources

who are not medical sources, but who know and have contact with the young adult." SSR 11-2p,

2011 WL 4055665 at *5.

The ruling notes the differences between structured and supportive settings and "real

world" work as follows:

> The young adult's ability to function in settings that are less demanding, more
> structured, or more supportive than those in which people typically work does not
> necessarily show how the young adult will be able to function in a work setting. . . .
> The more extra help or support of any kind that a young adult receives because of his
> or her impairment(s), the less independent he or she is in functioning, and the more
> severe we will find the limitation to be.

SSR 11-2p, 2011 WL 4055665, at *7.  SSR 11-2p further recognizes that "[r]egardless of whether

the work was [substantial gainful activity], information about how well a young adult performed

in these placements can help us assess how the young adult functions."  *Id.*  The ruling

appropriately acknowledges that "[w]orking requires a person to be able to do the tasks of a job

independently, appropriately, effectively, and on a sustainable basis."  *Id.* at *8.  Accordingly,

> If a young adult can function only if he or she receives more help than would generally
> be provided to people without medical impairments, we consider how well the young
> adult would function without the extra help. The more extra help or support of any
> kind that a young adult receives because of his or her impairment(s), the less
> independent he or she is in functioning, and the more severe we will find the limitation
> to be.

*Id.*

### b.    Analysis

Discussion of E.M.'s intensive home treatment and regional center records was also largely

absent from the ALJ's decision.  While the ALJ referenced E.M.'s December 2013 behavioral

health assessments from the Home for Little Wanderers, the ALJ did not specify the weight she

afforded the related findings and opinions contained within those records.  A.R. 22.  Nor did the

ALJ mention E.M.'s assessment, treatment and/or services provided by the Safe at Home intensive

United States District Court
Northern District of California

home therapy program in 2013-2014, *id.* at 779-81; the independent living skills services E.M. received from Solutions Plus and the various regional centers near Los Angeles, California from 2016-2017, *id.* at 1040-44; the individual plan assessment conducted by RCEB in 2018, *id.* at 1035-37; Adult Enrichment Service's independent living skills assessment and services in 2018, *id.* at 1086-90; and/or services provided by Social Vocational Services in 2018, *id.* at 1091. The aforementioned assessments, treatments, and services were all provided during the time when E.M. was considered a "young adult" for purposes of Social Security Ruling 11-2p. *See* 2011 WL 4055665, at *2 (defining young adult as ages eighteen to approximately twenty-five years-old).

Like E.M.'s special education records, SSR 11-2p required the ALJ to address E.M.'s intensive home treatment and regional center/vocational records, and the ALJ's apparent rejection of this entire category of evidence similarly disregarded SSR 11-2p. Again, the Court recognizes that the ALJ was not required to address each individual finding and opinion in the intensive home treatment records. *See Molina*, 674 F.3d at 1114. Nevertheless, the ALJ was required by SSR 11-2p to discuss how E.M.'s participation in these programs – which constituted highly structured or supportive settings – impacted the ALJ's determination regarding his RFC. *See* SSR 11-2p, 2011 WL 4055665, at *7-10. The ALJ erred in failing to do so.

### i.    Opinions in Intensive Home Treatment Records

E.M. points to the opinions of two clinicians in particular, including:  (1) Home for Little Wanderers clinician Sarah Happel's April 14, 2014 opinion regarding E.M.'s inability to maintain satisfactory interpersonal relationships, A.R. 810-813; and (2) Safe at Home clinician Hillary Pearlman's findings regarding E.M.'s needs, A.R. 779.[23]

Neither Happel nor Pearlman constitute "acceptable medical sources" pursuant to the controlling regulations.  20 C.F.R. § 416.902.  Instead, as a social worker and family therapist, respectively, they are considered non-medical sources.  *See Roundtree v. Colvin*, No. EDCV 14–

---

[23] As noted above, in November 2013, Safe at Home clinician Hillary Pearlman, conducted an assessment and plan for E.M., in which she found that E.M. required intensive home therapy meetings, school counseling, and medication management.  A.R. 779.  Several months later, in April 2014, Home for Little Wanderers clinician Sarah Happel, completed a form questionnaire in which she found that E.M. possessed "marked" functional limitations in his ability to maintain satisfactory interpersonal relationships with teachers and peers.  *Id.* at 813.

1   00803–JEM, 2015 WL 667696, at *6 (C.D. Cal. Feb. 17, 2015) ("marriage and family therapists

2   are not acceptable medical sources"); *Cody B. v. Comm'r, Soc. Sec. Admin.*, No. 3:19-CV-01293-

3   BR, 2022 WL 252752, at *8 (D. Or. Jan. 27, 2022) (licensed clinical social workers are not

4   acceptable medical sources).  Accordingly, their opinions were not entitled to controlling weight,

5   requiring either clear and convincing or specific and legitimate reasons for rejection.

6          Nevertheless, Happel and Pearlman constituted non-medical lay witnesses whose

7   statements were made directly relevant to the ALJ's analysis of E.M.'s functional capacity by SSR

8   11-2p, thus requiring the ALJ to provide germane reasons for rejecting their opinions.  *See Tobeler*

9   *v. Colvin,* 749 F.3d 830, 832 (9th Cir. 2014) (citing *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir.

10   2001)) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

11   into account, unless he or she expressly determines to disregard such testimony and gives reasons

12   germane to each witness for doing so."); *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009)

13   (noting that lay witnesses may base their testimony on their observations, rather than medical

14   expertise).

15          Here, the ALJ failed to provide any reasons at all, let alone "germane" reasons, for

16   ignoring the opinions of Happel and Pearlman.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th

17   Cir. 2005) ("Germane reasons for discrediting a lay-witness's testimony include inconsistency with

18   the medical evidence and the fact that the testimony 'generally repeat[s]' the properly discredited

19   testimony of a claimant."); *L.F. v. Saul*, No. 20-CV-04708-SVK, 2022 WL 19318, at *5 (N.D.

20   Cal. Jan. 3, 2022) ("Lay witness testimony as to a claimant's symptoms or how an impairment

21   affects ability to work is competent evidence and therefore cannot be disregarded without

22   comment.").  Because the Court's review of Happel's and Pearlman's opinions confirms that both

23   are relevant to E.M.'s RFC, the ALJ was required to provide germane reasons for rejecting their

24   opinions and erred by failing to do so.  Accordingly, the ALJ should address their opinions, along

25   with this general category of record evidence, on remand.

26          **ii.      Opinion From Regional Center Records**

27          E.M. also points to fairly extensive findings regarding his functional capacity made by

28   Harpreet Kaur, a program director for Adult Enrichment Services, an organization that worked

United States District Court
Northern District of California

1   with the regional center, RCEB, to provide individual plan assessment and independent living

2   services.  A.R. 1086-90; *see supra* Order at 10.  The ALJ did not mention Ms. Kaur's assessment

3   or findings in her decision.

4        Again, like Ms. Happel and Ms. Pearlman, Ms. Kaur does not constitute an "acceptable

5   medical source" pursuant to the controlling regulations.  *See* 20 C.F.R. § 416.902.  Instead, as a

6   program director, she is considered a non-medical source, whose findings were nevertheless made

7   relevant by SSR 11-2p.  Ms. Kaur's assessment addressed how E.M.'s "impairment affect[ed his]

8   ability to work," and thus could "not be disregarded without comment."  *L.F. v. Saul*, 2022 WL

9   19318, at *5; *see also Tobeler*, 749 F.3d at 832; *Lewis*, 236 F.3d at 511 (9th Cir. 2001).  Because

10  the ALJ failed to provide any reasons at all, let alone "germane" reasons, for ignoring Ms. Kaur's

11  opinion, the ALJ erred.

12       In reaching the above conclusions, the Court is not finding that E.M.'s special education,

13  intensive home treatment, and regional center records establish that he is disabled.  The Court

14  simply concludes that further administrative proceedings are necessary for the ALJ to consider the

15  evidence regarding E.M's educational programs, community experiences, including job

16  placements, psychosocial supports and highly structured or supportive settings, and extra help and

17  accommodations required by SSR 11-2p, including the specific non-medical source opinions

18  discussed above.

19         **D.**    **ALJ's Rejection of Examining and Treating Clinicians' Opinions**

20            **1.**     **Background Legal Standards**

21       The Commissioner's rules and regulations regarding the evaluation of medical evidence

22  were revised in March 2017, and apply to claims filed on or after March 27, 2017.  See 20 C.F.R.

23  § 404.1520c.  For claims filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply.  *Id.*

24  Because E.M.'s claims were filed before March 27, 2017, the Court applies the rules then in effect

25  under 20 C.F.R. § 404.1527.

26       There are three types of medical opinions -- treating, examining, and non-examining.  *See*

27  *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009); *Lester v. Chater*, 81

28  F.3d 821, 830-31 (9th Cir. 1995) (amended April 9, 1996).  For claims filed before March 27,

United States District Court
Northern District of California

33

2017, each type is accorded different weight.  20 C.F.R. §§ 404.1527, 416.927.  Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant.  *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  Medical opinions and conclusions of treating physicians are accorded special weight because these physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems.  *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *see also Bray*, 554 F.3d at 1228 ("A treating physician's opinion is entitled to 'substantial weight.'"); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)) (This court "afford[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'").

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(6) (2016); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  The failure to consider these factors, by itself, constitutes reversible error.  *See Trevizo*, 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion.  The legal standard that applies to the ALJ's proffered reasons depends on whether the treating physician's opinion is contradicted by another physician.  *Id.; see also Parra v. Berryhill*, No. 18-CV-06201-VKD, 2020 WL 43218, at *2–3 (N.D. Cal. Jan. 3, 2020).  When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and

United States District Court
Northern District of California

1    convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence.

2    *Id.* at 675.  When a treating physician's opinion is contradicted by another physician, an ALJ must

3    provide "specific and legitimate reasons" for rejecting or discounting the treating physician's

4    opinion, supported by substantial evidence.  *Id.*  "The ALJ can meet this burden by setting out a

5    detailed and thorough summary of the facts and conflicting clinical evidence, stating his

6    interpretation thereof, and making findings."  *Magallanes*, 881 F.2d at 751 (quotations and citation

7    omitted).

8        The opinion of an examining physician is, in turn, entitled to greater weight than the

9    opinion of a nonexamining physician.  *See Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).

10   As is the case with the opinion of a treating physician, the Commissioner must provide "clear and

11   convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  *Id.*  And

12   like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by

13   another doctor, can only be rejected for specific and legitimate reasons that are supported by

14   substantial evidence in the record.  *See Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

15       The ALJ must consider all medical opinion evidence, and "[w]here an ALJ does not

16   explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one

17   medical opinion over another, he errs."  *Garrison*, 759 F.3d at 1012; *see also Tommasetti v.*

18   *Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  Thus, "an ALJ errs

19   when he rejects a medical opinion or assigns it little weight while doing nothing more than

20   ignoring it, asserting without explanation that another medical opinion is more persuasive, or

21   criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."

22   *Garrison*, 759 F.3d at 1012-13.  In conducting the review, the ALJ must consider the entire record

23   and cannot rely only on portions of the record while ignoring conflicting evidence.  *See Holohan*

24   *v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (finding error where "ALJ selectively relied

25   on some entries in [plaintiff's] records from San Francisco General Hospital and ignored the many

26   others that indicated continued, severe impairment.").

27               **2.       Treating Psychologist, Dr. Patrick O'Reilly**

28       As discussed above, psychologist Dr. O'Reilly treated E.M. in 2018.  A.R. 1064.  He

United States District Court
Northern District of California

1    diagnosed E.M. with schizophrenia and borderline intellectual functioning and opined that E.M.

2    would do well in a day treatment plan.  *Id.*

3          The ALJ failed to mention Dr. Patrick O'Reilly in his decision, and E.M. argues that the

4    failure to do so was error because the ALJ was required to provide either clear and convincing or

5    specific and legitimate reasons for rejecting his opinion.  The Court disagrees.

6          Dr. O'Reilly's opinion set forth no functional limitations but simply contained the

7    recommendation regarding a day treatment plan.  *Id.*  An ALJ is not required to address physician

8    recommendations regarding conditions that might be optimal but are not necessary for a claimant

9    to work.  *See Harms v. Berryhill*, 692 F. App'x 861, 862 (9th Cir. 2017) ("An examining

10   psychologist's and a reviewing psychologist's recommendations regarding a supportive work

11   setting did not amount to concrete work-related limitations in function that the [ALJ] was required

12   to include in his finding of the claimant's [RFC].").  Dr. O'Reilly's recommendation was "neither a

13   diagnosis nor a statement of [E.M.'s] functional capacity," but "rather a recommended way for

14   [E.M.] to cope with his . . . symptoms."  *Valentine*, 574 F.3d at 691-92 (physician's opinion that

15   claimant "is less likely to have difficulty with" certain tasks was a recommendation, not a

16   statement that claimant was only capable of the recommended tasks).

17         Accordingly, the ALJ did not err in ignoring Dr. O'Reilly's opinion because it did not

18   impact E.M.'s RFC assessment.  *See id.*

19                   **3.       Examining Psychologist, Dr. Kaely Shilakes**

20         As discussed above, Dr. Shilakes assessed E.M. in 2015, when he was attending high

21   school in Los Angeles, California.  A.R. 1071-84.

22         The ALJ discussed Dr. Shilakes' assessment and testing results in detail in her description

23   of the medical evidence pertaining to E.M.'s RFC. [24]  *Id.* at 23-24.  However, in what appears to be

24   _____

25   [24] Specifically, the ALJ noted:

26         A psychological assessment was conducted by Dr. Shilakes in March 2015 to
         determine [E.M.'s] eligibility for services from Westside Regional Center.  [E.M.]
27       reported that he was not able to count change from a purchase and needed help paying
         bills and budgeting.  He also reported anxiety, difficulty sleeping, and feeling
28       depressed for four days per week.  He reported self-talk and voices around age

an oversight, the ALJ failed to subsequently ascribe any weight to Dr. Shilakes' opinion. *See id.* at 25-26 (detailing the weight afforded other medical opinions).

E.M. argues that the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Shilakes' opinion regarding his limitations. The Commissioner concedes that the ALJ failed to assign any particular weight to Dr. Shilakes' opinion but contends that the ALJ was not required to because Dr. Shilakes "did not provide any actual functional limitations."

Unlike Dr. Patrick O'Reilly, Dr. Shilakes did in fact provide numerous findings relevant to E.M.'s functional and work-related limitations. Notably, Dr. Shilakes opined regarding E.M.'s cognitive and memory deficits, his visual motor integration skills, his need for help with daily activities, his required ongoing regional center support, and his limited judgment. *See id.* at 1079-81. Moreover, the ALJ relied on Dr. Shilakes' findings in rejecting the opinion of another examining physician, Dr. San Pedro, thus suggesting that the ALJ indeed found Dr. Shilakes' opinion relevant to E.M.'s RFC assessment. *See id.* at 26.

Accordingly, the ALJ was required to state the weight she afforded examining physician, Dr. Shilakes' opinion, and to set forth clear and convincing or specific and legitimate reasons to the extent she rejected the opinion. *See Garrison*, 759 F.3d at 1012 ("Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, [s]he errs."). In failing to do so, the ALJ erred. On remand, the ALJ should assess Dr. Shilakes' opinion and explain the weight she is affording it.

### 4.     Examining Psychologist, Dr. Lara San Pedro.

In January 2019, psychologist Dr. Lara San Pedro conducted a psychological evaluation of E.M. during which she interviewed E.M., his mother, and his sister, and administered several tests. A.R. 1102-15. As noted, she diagnosed E.M. with moderate intellectual disability, major

---

[fourteen] and delusional thinking around age [fifteen]. They resolved with Risperdal and Seroquel. Mental status examination showed some mumbled speech and minor articulation errors, somewhat anxious mood, fatigued and depressed appearance, and questionable judgment.

A.R. 23-24.

United States District Court
Northern District of California

depressive disorder with psychotic features, generalized anxiety disorder, autism spectrum disorder (level one, requiring support with intellectual impairment), and unspecified schizophrenia and other psychotic disorder. *Id.* at 25, 1112. Dr. San Pedro made several findings regarding E.M.'s functional capacity based on the tests she conducted and the interviews and evaluation. *Id.* at 1109-05.

The ALJ set forth Dr. San Pedro's findings in detail in her decision, but found her opinion deserved "little weight." *Id.* at 25-26. In support, the ALJ provided four reasons. First, the ALJ asserted that Dr. San Pedro's conclusions were "at odds with [E.M.'s] demonstrated work activity." *Id.* at 25. Second, the ALJ stated that Dr. San Pedro's opinion was contrary to the MMSE scores from Drs. Kollath's and Shilakes' evaluations. *Id.* Third, the ALJ found that Dr. San Pedro relied on erroneous information from E.M. that he was not working when, in fact, he had been working at the time. *Id.* Finally, the ALJ suggested that Dr. San Pedro mistakenly relied on invalid test results from other providers. *Id.*

Dr. San Pedro constituted an examining physician, and her opinions regarding E.M.'s RFC differed from those of other examining physicians.[25] Because Dr. San Pedro's findings were contradicted by other examining and non-examining sources in the record, the ALJ was required to provide specific and legitimate reasons based on substantial evidence for rejecting Dr. San Pedro's opinion. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

---

[25] As noted, Dr. San Pedro opined that E.M. possessed moderate limitations in terms of his ability to "understand, remember, and carry out very short and simple instructions," which differed from the 2013 and 2015 opinions of Drs. Kollath and Sharokhi, respectively, that E.M. possessed only a mild limitation in this category. A.R. 1115, 567, 632. Dr. San Pedro also opined that E.M. possessed "marked" limitations in his ability to understand, remember, and carry out detailed instructions; perform at a consistent pace without an unreasonable number and length of rest periods; get along and work with others; and interact appropriately with the general public, and "extreme" limitations in his ability to accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting and deal with normal work stressors; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and maintain regular attendance and be punctual within customary, usually strict tolerances. *Id.* at 1115. By contrast, examining physicians Drs. Kollath and Sharokhi found only moderate or mild limitations in those categories. *Id.* at 567, 632. Non-examining, consulting physician Dr. Singh's findings in the above categories ranged from "no limitation" to mild or moderate limitations. *Id.* at 636.

United States District Court
Northern District of California

### a.   E.M.'s Work History and Current Work Status

The Court addresses together the two work-related reasons that the ALJ proffered as reasons for rejecting Dr. San Pedro's opinion.

In her January 11, 2019 assessment, Dr. San Pedro noted that E.M. was "not currently working," and that he "state[d] that he [would] be attending an internship program at Project Search in West Oakland" in February 2019.  A.R. 1103.  She further noted that E.M. had completed a vocational training program in Los Angeles, and that he had worked at "Smart & Final" during the program.  *Id.*  The ALJ found that Dr. San Pedro's findings were both "at odds with [E.M.'s] demonstrated work activity," and that Dr. San Pedro "relied on erroneous information. . . that [E.M.] was not working."  *Id.* at 25.

Specifically, the ALJ noted that E.M.'s January 22, 2019 hearing testimony established that, contrary to Dr. San Pedro's report, E.M. was working for Amazon when he was assessed by Dr. San Pedro on January 11, 2019.  *See id.* at 66-67 (testifying that he was working part-time at Amazon at the time of the hearing and that he had had the job since "around Thanksgiving").   The ALJ further suggested that Dr. San Pedro's failure to include in her report other jobs that E.M. held in the past at "Costco or Pak N Save" rendered her functional capacity assessment at odds with E.M.'s work history.  *Id.* at 25.

E.M. does not dispute that he was working at Amazon in January 2019, but instead argues that the ALJ mischaracterized his work history when she failed to account for the fact that his multiple attempts to work were through vocational training programs.  E.M. also notes that Dr. San Pedro's opinion was based on multiple sources of information in addition to his statements regarding his work history, including a comprehensive in-person evaluation, a review of his medical records, and her own objective testing.

As is the case with most psychiatric exams, Dr. San Pedro relied in part on E.M.'s self-report, during which E.M. appears to have provided inaccurate information regarding his current work status.  *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (noting that psychiatric "[d]iagnoses will always depend in part on the patient's self-report").  The Ninth Circuit has recognized that where a mental health provider relies in part on the claimant's self-reported

1   symptoms but also relies on objective procedures and tests, it is error for the ALJ to reject the

2   provider's opinion based on a determination that the claimant's self-reporting is unreliable.  *Id.*

3   This is because:

4

5          [p]sychiatric evaluations may appear subjective, especially compared to evaluation in
    other medical fields. Diagnoses will always depend in part on the patient's self-report,

6          as well as on the clinician's observations of the patient. But such is the nature of
    psychiatry. *See Poulin* [*v. Bowen*], 817 F.2d [865,] 873 [ (D.C. Cir. 1987) ] ("[U]nlike

7          a broken arm, a mind cannot be x-rayed."). Thus, the rule allowing an ALJ to reject
    opinions based on self-reports does not apply in the same manner to opinions regarding

8          mental illness.

9   *Id.*

10         Here, Dr. San Pedro conducted an in-person clinical interview and a mental status

11   examination, reviewed medical records, and administered several tests.  Her report contained

12   detailed information about E.M.'s history and background including sections addressing his

13   family, social, and development history; his education; his medical and psychiatric history; and his

14   current symptoms.  A.R. 1102-13.  Even if E.M. misrepresented his current work history, the ALJ

15   could not reject Dr. San Pedro's opinion simply because it was based on E.M.'s erroneous self-

16   report.  *See Buck*, 869 F.3d at 1049.  Given the other objective measures employed by Dr. San

17   Pedro, E.M.'s misrepresentation did not provide a specific and legitimate reason for rejecting Dr.

18   San Pedro's opinion in its entirety.  *See id.*

19         Moreover, the ALJ's failure to consider and analyze E.M.'s regional center and vocational

20   training records as required by SSR 11-2p impedes the Court's review and analysis of this issue:

21   the legal sufficiency of the ALJ's rejection of Dr. San Pedro's opinion because it was "at odds with

22   [E.M.'s] demonstrated work activity."  In assessing E.M.'s RFC, the ALJ noted that E.M. "had

23   demonstrated the ability to work at Costco, Pak N Save, and Amazon." A.R. 25.  However, the

24   ALJ failed to mention or discuss that E.M. held these jobs through the types of supported and

25   structured on-the-job program placements and trainings specifically referenced by SSR 11-2p.

26   2011 WL 4055665, at *7.  That ruling required the ALJ to evaluate whether the jobs E.M. held

27   while participating in regional center vocational programs in fact demonstrated that E.M. had the

28   capacity to work absent such support and/or assistance.  *See id.*  (noting that "the young adult's

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

ability to function in settings that are less demanding, more structured, or more supportive than those in which people typically work does not necessarily show how the young adult will be able to function in a work setting").  Given the absence of any discussion of the regional center records, including vocational programs, the Court is unable to conclude that E.M.'s work history provided a "specific and legitimate" reason for the ALJ to reject Dr. San Pedro's opinion.

        **b.**        **Mini-Mental State Exam (MMSE) Scores from Drs. Kollath and Shilakes**

As previously noted, nearly six years prior to Dr. San Pedro's assessment, in 2013, when E.M. was nineteen years-old, consultative examiner Dr. Kollath performed a psychological evaluation to identify E.M.'s mental limitations.  A.R. 22, 563-67.  The MMSE was among the tests that Dr. Kollath administered, and E.M scored twenty-four out of thirty on the test, which, according to Dr. Kollath, was "fair."  *Id.*  By comparison, when Dr. Shilakes administered the MMSE to E.M. on March 31, 2015, when E.M. was twenty years-old, he scored twenty-nine out of thirty, which Dr. Shilakes opined suggested "normal cognitive function."  *Id.* at 1077.  Although she performed numerous objective tests, unlike Drs. Shilakes and Kollath, Dr. San Pedro does not appear to have administered the MMSE.  *Id.* at 1106, 1108-09, 1115.

The ALJ rejected Dr. San Pedro's opinion in part because it was "at odds with. . . the MMSE scores at the evaluations with Drs. Kollath and Shilakes." *Id.* at 25.  There are several reasons why this was not a sufficient basis for rejecting Dr. Pedro's opinion.

First, the ALJ appears to have "cherry-picked" the results of one particular objective test – the MMSE – among many that were conducted by the three doctors, Drs. Kollath, Shilakes, and San Pedro.  *See Holohan*, 246 F.3d at 1207-08 (finding error where ALJ cherry-picked certain entries in records while ignoring others).  The ALJ offered no explanation as to why she was giving the particular test extra weight in rejecting Dr. San Pedro's opinion.  Dr. Pedro conducted many objective tests herself, including the Autism Diagnostic Observation Schedule, the WAIS-IV (administered by both Drs. Kollath and Shilakes as well), the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), and the Vineland Adaptive Behavior Scales

41

(VABS) (administered also by Dr. Shilakes).  A.R. 1102.[26]  The ALJ did not observe or explain why the MMSE produced results superior to the other objective tests utilized by Dr. San Pedro.

Second, Dr. San Pedro's assessment was not limited to cognitive functioning.  As noted, she also diagnosed E.M. with several mental health impairments, including major depressive disorder with psychotic features, generalized anxiety disorder, and unspecified schizophrenia and other psychotic disorder.  *Id.* at 1112.  The MMSE, however, measured E.M.'s cognitive functioning – not his mental health disorders -- and thus pertained, if at all, to a narrow portion of Dr. Pedro's opinion.   Accordingly, because Dr. San Pedro's opinion was not limited to assessing cognitive issues, E.M.'s past scores on the MMSE, as conducted by other medical sources, did not constitute a legitimate reason supported by substantial evidence for rejecting Dr. San Pedro's opinion in its entirety.  *See, e.g., Morris v. Berryhill*, 358 F. Supp. 3d 875, 882–83 (D. Ariz. 2019) (rejecting the ALJ's reliance on the findings of a mini-mental status examination that did not address the plaintiff's limitations from her schizoaffective and depressive disorders); *Williams v. Comm'r of Soc. Sec. Admin.*, No. CV-20-00451-PHX-GMS, 2021 WL 389313, at *3 (D. Ariz. Feb. 4, 2021) (citing *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014)) (noting that "observations of cognitive functioning do not contradict . . . . symptoms of depression and social anxiety"); *see also Norris v. Comm'r of Soc. Sec. Admin.*, No. CV-19-08047-PCT-DWL, 2020 WL 1615535, at *4 (D. Ariz. Apr. 2, 2020) (holding that MMSE score alone did not constitute a legitimate reason to reject doctor's opinion because the MMSE score did not address or explain away the doctor's "other opinions as to the other Paragraph B criteria, which [did not] address the claimant's cognitive ability and instead touch upon other aspects of psychological functioning, such as persistence and the possession of the social skills necessary to hold down a job").

Additionally, Dr. San Pedro's 2019 test results and RFC opinion were the most recent medical source results and opinion of those in the record.  By contrast, Dr. Kollath's MMSE test results were from December 2013, more than five years prior to Dr. San Pedro's evaluation and

---

[26] By comparison, Dr. Kollath administered the WAIS-IV, the MMSE, the Wechsler Memory Scale (WMS), and the Trail Making Test (TMT).  A.R. 566.  Dr. Shilakes administered the WAIS-IV, the MMSE, the VABS, the Wide Range Achievement Test (WRAT), and the Beery Buktenica Development Test of Visual Motor Integration (Beery).  *Id.* at 1072.

1   testing and the ALJ's hearing.  A.R. 563.  Similarly, Dr. Shilakes tested E.M. in March 2015,

2   nearly four years prior to Dr. San Pedro's opinion.  *Id.* at 1077.  Furthermore, Dr. San Pedro's 2019

3   RFC opinion was itself consistent with opinions from other relevant non-medical sources, such as

4   the intensive home treatment clinicians whose opinions were not explicitly considered by the ALJ.

5   *See id.* at 1086-90; *see also id.* at 813.

6          Finally, it is problematic that the ALJ cites to Dr. Shilakes' MMSE results as a reason for

7   rejecting Dr. San Pedro's opinion when the ALJ failed to ascribe any particular weight to Dr.

8   Shilakes' opinion.

9          Accordingly, the MMSE scores did not provide a legitimate reason for rejecting Dr. San

10  Pedro's opinion.

11                    **c.       Psychometric Testing Results**

12         As a final reason for rejecting Dr. San Pedro's opinion, the ALJ cited Dr. San Pedro's

13  reliance on "psychometric testing" from other medical sources.  *Id.* at 25-26.  The ALJ noted that

14  "Dr. San Pedro reviewed Dr. Shilakes['] report and cited the full-scale IQ but failed to

15  acknowledge that [Dr. Shilakes] believed that the scores should be interpreted with caution."  *Id.*

16  at 26.[27]  The ALJ also noted that "the consultative examiners [Drs. Kollath and Sharokhi] had

17  observed limited [and] inconsistent effort [on E.M.'s part] during testing."  *Id.*

18         The ALJ appears to have mistakenly assumed that Dr. San Pedro relied on the other

19  doctors' test results in formulating her own opinion.  *Id.* at 25-26.  That was not the case, though.

20  Dr. San Pedro performed her own objective tests and based her opinions on the tests she

21  conducted.  *Id.* at 1102-15.  Thus, this also does not constitute a specific and legitimate reason for

22  rejecting Dr. San Pedro's opinion.

23         In sum, the ALJ erred by failing to provide specific and/or legitimate reasons for according

24  Dr. San Pedro's opinion little weight.

25                    **E.       Rejection of E.M.'s Symptom Testimony**

26         The ALJ rejected E.M.'s testimony regarding the "alleged intensity, persistence, and

27  _____

28  [27] As noted in the Court's discussion of the IQ testing, Dr. Shilakes opined that the results of her
    tests were valid.  A.R. 730.

United States District Court
Northern District of California

1    limiting effects of [his] symptoms" as "inconsistent with the objective medical evidence *for the*

2    *reasons explained in this decision*." *Id.* at 22 (emphasis added).  E.M. argues that the ALJ's

3    rejection of his testimony and her failure to explicitly address any inconsistencies constituted

4    error.  The Court agrees.

### 1.    Legal Standards

6        In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.

7    *Trevizo*, 871 F.3d at 678.  The ALJ must first determine "whether the claimant has presented

8    objective medical evidence of an underlying impairment 'which could reasonably be expected to

9    produce the pain or other symptoms alleged.' " *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

10   1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

11   If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can

12   reject the claimant's testimony as to the severity of the symptoms  "'only by offering specific,

13   clear and convincing reasons for doing so.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80

14   F.3d at 1281).  These reasons must be "sufficiently specific to permit the court to conclude that the

15   ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958

16   (9th Cir. 2002). "General findings are insufficient." *Reddick*, 157 F.3d at 722.

### 2.    Analysis

18       Here, the ALJ did not provide any explicit reasons for rejecting E.M.'s testimony, but

19   instead relied on the type of boilerplate assertion --  that his testimony was "inconsistent with the

20   objective medical evidence for the reasons explained in this decision" --  which the Ninth Circuit

21   has held is insufficient.  A.R. 22; *see Wade v. Saul*, 850 F. App'x 568, 569 (9th Cir. 2021) (citing

22   *Lambert v. Saul*, 980 F.3d 1266, 1277-78 (9th Cir. 2020)) ("ALJ's detailed overview of [a

23   claimant's] medical history—coupled with a nonspecific boilerplate conclusion that [his]

24   testimony [i]s "not entirely consistent" with [his] medical treatment—is not enough to satisfy the

25   minimal requirements for assessing credibility.").  The ALJ never identified which testimony she

26   found not credible and never explained which evidence contradicted that testimony.  The absence

27   of such explicit reasons constituted reversible error, which cannot be saved by the post hoc

28   rationalizations now offered by the Commissioner before the Court.  *See Lambert*, 980 F.3d at

United States District Court
Northern District of California

1278 (quoting *Treichler*, 775 F.3d at 1103) (reversing and holding that court "cannot treat the error as harmless" where ALJ failed to provide "enough 'reasoning in order for the court to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence'"); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).

### F.    Rejection of Lay Witness Testimony

E.M.'s sister, F.M., and his brother, E.T.M., submitted sworn statements on E.M.'s behalf, which are summarized above.  A.R. 382, 383-85.  The ALJ rejected E.M.'s sister's and brother's testimony, affording them "little weight."  *Id.* at 26.

### 1.    Legal Standards

"Lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence and therefore cannot be disregarded without comment."  *Tobeler*, 749 F.3d at 832.  As lay witnesses, those individuals may base their testimony on their observations, rather than medical expertise.  *Bruce*, 557 F.3d at 1116.  "Germane reasons for discrediting a lay-witness's testimony include inconsistency with the medical evidence and the fact that the testimony 'generally repeat[s]' the properly discredited testimony of a claimant."  *Bayliss*, 427 F.3d at 1218.

### 2.    Analysis

#### a.    Brother's Testimony

E.M.'s brother, E.T.M., exclusively cared for E.M. for several years in Massachusetts and Southern California.  A.R. 382.  He described his time living with E.M. and past services E.M. received during those times.  *Id.*  As noted, E.T.M is also a licensed psychologist, and he questioned consulting psychologist Dr. Sharokhi's test results based on the amount of time (or the lack thereof) that Dr. Sharokhi spent with E.M. during the doctor's evaluations.  *Id.*

Regarding E.T.M.'s testimony, the ALJ simply agreed with E.T.M.'s opinion that Dr. Sharokhi's December 2014 and September test results were invalid.  *Id.*  However, the ALJ disagreed regarding the reason, finding that it was E.M.'s "variable effort," which invalidated the results, as opposed to an alleged insufficiency of time for Dr. Sharokhi to evaluate E.M.  *Id.* at 26.

While the ALJ's reason for rejecting E.T.M.'s opinion regarding Dr. Sharokhi's evaluation

United States District Court
Northern District of California

was germane and supported by other medical sources in the record, the reason did *not* address E.M's brother's testimony regarding E.M.'s education, vocational services, and other programs E.M. attended based on his disabilities. *Id.* at 382. While the ALJ is not required to address the brother's testimony on a line-by-line basis, the ALJ nevertheless erred in not offering a germane reason for rejecting what constituted the bulk of E.T.M.'s testimony, instead focusing only on a limited statement. Because E.T.M.'s testimony includes additional details that are relevant to the ALJ's RFC determination, on remand, the ALJ should consider the brother's additional testimony, afford it the appropriate weight, and state the reasons, if any, for rejecting that testimony.

### b.      Sister's Testimony

The ALJ also appears to have rejected E.M.'s sister's testimony in its entirety, noting simply that the record did not support the "anger outbursts" from E.M. that she described. A.R. 26, 384. The ALJ's statement is inaccurate and contrary to the record. *See id.* at 398 (noting that E.M. was suspended several times from school for threats and violent behavior against other children); *id.* at 399 (E.M. denied admission to learning center in tenth grade based on mistreatment of other students); *id.* at 765-66 (E.M. recommended for "extra weapons check" in high school based on his behavior toward other students); *id.* at 1024 (E.M. recounts dreams of hurting other people). Accordingly, the inaccurate statement did not constitute a sufficiently "germane" reason for rejecting E.M.'s sister's testimony, and the ALJ therefore erred in rejecting E.M.'s sister's testimony.

### G.      Assessment of E.M.'s RFC

In a claim related to the above claims, E.M. argues that the ALJ failed to properly assess his RFC based on the record evidence, including the medical and non-medical findings and opinions, that she erroneously rejected. E.M. contends that the erroneously discounted evidence would have supported a finding that he would have been "off-task more than ten percent of the time and/or would [have been] absent from work at least two days per month or late to work three days per month." Pl. Mot. for Summ. J. at 23. He notes that the VE testified in response to his counsel's hypothetical at the hearing that such limitations would preclude employment. *See* A.R. 78-79.

United States District Court
Northern District of California

An ALJ assesses a claimant's RFC "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1).  The ALJ must consider both the medical evidence and "descriptions and observations of [the claimant's] limitations from [the claimant's] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by" the claimant, family, friends, and other people.  *Id.* § 416.945(a)(3).  The RFC assessment must "[c]ontain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate." *Laborin v. Berryhill*, 867 F.3d 1151, 1152 (9th Cir. 2017) (citations omitted).  In other words, the ALJ must take "the claimant's subjective experiences of pain" into account when determining the RFC.  *Garrison*, 759 F.3d at 1011; *see also Lingenfelter*, 504 F.3d at 1035.  However, the responsibility for deciding RFC rests with the ALJ.  *See* 20 C.F.R. § 404.1546.

As set forth above, the Court remands on several bases, including for the ALJ to:  (1) explicitly consider E.M.'s special education, intensive home treatment, and regional center and/or vocational records pursuant to Social Security Ruling 11-2p, including but not limited to the findings from Sarah Happel (Home for Little Wanderers), Hilary Pearlman (Safe at Home), and Director Harpreet Kaur (Adult Enrichment Services);  (2) consider and ascribe the weight afforded to psychologist Dr. Kaely Shilakes' opinion;  (3) reconsider and reweigh psychologist Dr. Lara San Pedro's opinion; (4) reconsider and reweigh E.M.'s testimony; and (5) reconsider and reweigh E.M.'s brother's and sister's testimony.  Because the ALJ's RFC determination was based in part on (or failed to address) those opinions, testimony, and records, the Court remands on this claim as well.

In assessing E.M.'s disability on remand, the ALJ is required to reformulate the hypothetical to the VE to encompass any changes required by the Court's ruling.  However, the Court declines to direct the ALJ as to the specific limitations that must be included in the VE's reworked hypothetical on remand.  The appropriate limitations will depend on the outcome of the remanded proceedings.

### H. Constitutional Claim

Finally, E.M. argues that the ALJ's appointment violates the Appointments Clause of the United States Constitution under *Seila Law*, thus rendering her decision in this case invalid. *Seila Law LLC v. Consumer Fin. Prot. Bureau,* 140 S. Ct. 2183, 2197 (2020) (holding that the Consumer Financial Protection Bureau's ("CFPB") removal structure, which allowed for the CFPB director to be removed by the President of the United States only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers by insulating the director from removal by the President).[29]

At the outset, the Commissioner accurately concedes that 42 U.S.C. § 902(a)(3), which limits the President's authority to remove the Commissioner, violates the separation of powers to the extent it prohibits the President from removing the Commissioner without cause. *See* Def. Cross-Mot. for Summ. J. at 3; *Collins v. Yellen,* 141 S. Ct. 1761, 1783 (2021) (concluding that a provision limiting the President to a removal of the Federal Housing Finance Agency ("FHFA") director for cause violated the separation of powers for the same reasons set forth in *Seila*); *see also Jason V. v. Comm'r Soc. Sec.*, No. C21-5227-SKV, 2022 WL 575703, at *5 (W.D. Wash. February 25, 2022) (noting that 42 U.S.C § 902(a)(3) suffers from the same defect as the removal provisions in *Seila* and *Collins*).

The Commissioner and E.M. also correctly agree that E.M. is required to show harm to obtain rehearing or relief, and that the harm E.M. must demonstrate may not be based exclusively on the existence of the unconstitutional removal clause, 42 U.S.C. § 902(a)(3). *See* Def. Cross-Mot. for Summ. J. at 3-4; Pl. Reply at 11 (agreeing with the Commissioner "that Plaintiff is not entitled to relief  'unless and until he shows harmful error in the decision the ALJ issued on his claim'"); *Collins*, 141 S. Ct. at 1787-88 (holding that a removal procedure that violates the separation of powers does not automatically render void all actions taken by the director).

E.M. suggests that he was harmed for two reasons:  (1) because the ALJ who issued the

---

[29] E.M. narrows and clarifies his argument in his reply, accounting for several intervening events following the filing of his original June 2021 motion for summary judgment, including a subsequent decision by the United States Supreme Court.

1  decision in his case was "appointed [by] and acted unlawfully under the authority of a

2  constitutionally defective Commissioner;"  and (2) based on the ALJ's errors on his substantive

3  claims.

4         To demonstrate that the unconstitutional provision, 42 U.S.C. § 902(a)(3),  inflicted

5  "compensable harm," E.M must "show a link between the denial of his claim for disability

6  benefits and the alleged unconstitutional removal provision. "  *Sean E. M. v. Kijakazi*, No. 20-CV-

7  07295-SK, 2022 WL 267406, at *4 (N.D. Cal. Jan. 28, 2022) (citing *Collins*, 141 S. Ct. at 1788);

8  *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (refusing to unwind the ALJ's

9  decision where there was no showing that the alleged unlawful removal provision "tainted" the

10  ALJ's decision); *Bayview Loan Servicing, LLC v. 6364 Glenolden St. Tr.*, 2021 WL 4938115, at *2

11  (9th Cir. Oct. 22, 2021) (explaining that plaintiff could recover damages for alleged unlawful

12  removal provision under *Collins* "only by causally linking a specific, tangible harm to the for-

13  cause removal provision").

14         Here, E.M. did not suffer harm simply because the ALJ's delegation of authority came

15  from the Commissioner, whose appointment was "constitutionally defective." *See Collins*, 141 S.

16  Ct. at 1788, n. 23 ("unlawfulness of the removal provision does not strip the Director of the power

17  to undertake the other responsibilities of his office"); *see also Flores v. Garland*, No. 19-72559,

18  2022 WL 501360, at *2-3 (9th Cir. February 18, 2022) (holding that petitioner was not entitled to

19  a rehearing before an immigration judge ("IJ") in removal proceedings simply because the IJ's

20  appointment may have violated the Constitution's separation of powers under *Collins* because he

21  had not shown any harm).  That is in part because the unconstitutional removal provision, 42

22  U.S.C § 902(a)(3), was severable and did not undermine the authority of the Commissioner and

23  the SSA to function.  *See Seila Law*, 140 S. Ct. at 2209 ("The provisions of the Dodd-Frank Act

24  bearing on the CFPB's structure and duties remain fully operative without the offending tenure

25  restriction."); *accord Sean E.M.,* 2022 WL 267406 at 4;  *Lisa Y.*, —— F. Supp. 3d ——, 2021 WL

26  5177363, at *6-7 (W.D. Wash. Nov. 8, 2021) (rejecting argument that removal clause rendered

27  SSA's structure unconstitutional and the Commissioner without any authority to delegate to the

28  ALJ and Appeals Council).

United States District Court
Northern District of California

Additionally, E.M is unable to demonstrate harm based simply on the Commissioner's delegation of authority to the ALJ because the ALJ here, like all ALJs in social security appeals, was performing an adjudicative function. *See Cindy S. v. Comm'r of Soc. Sec.,* No. C21-5642-MLP*, 2022 WL 523011, at *4–8 (W.D. Wash. Feb. 22, 2022) (citing *Decker Coal. Co.,* 8 F.4th at 1133) (holding no harm where Department of Labor ("DOL") ALJs adjudicated claims under the Black Lung Benefits Act and performed "purely adjudicative function[s]").  Moreover, the role of district courts in reviewing social security appeals further "precludes any possibility that the statutory removal provision causes claimants [like E.M.] any harm." *Sean E.M.,* 2022 WL 267406 at 5; *see also Brand v. Kijakazi*, No. 2:20-CV-02219-NJK, ⸺ F. Supp. 3d ⸺, 2021 WL 5868131, at *5-6 (D. Nev. Dec. 10, 2021); *Sarah H. v. Comm'r of Soc. Sec.*, No. 3:21-cv-05149-JRC, 2021 WL 5770269, at *5 (W.D. Wash. Dec. 6, 2021); *Brinkman v. Kijakazi*, No. 2:21-cv-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) ("Plaintiff has not shown that whether the President could remove the SSA Commissioner without limitations . . .  impacted the independence of the ALJ or his decision in Plaintiff's case.  It is well settled that the ALJ must exercise his independent judgment on the evidence before him.") (internal quotation marks and citations omitted).

In sum, while the removal clause in 42 U.S.C § 902(a)(3) violates the separation of powers, it does not automatically cause harm to E.M.; nor does the Commissioner's delegation of authority to the ALJ automatically harm E.M.  Rather, the basis for the Court's determination to reverse the Commissioner's final decision is the Court's independent review of the administrative record and the ALJ's decision, and the Court's conclusion that the ALJ erred on several substantive claims.  *See Lisa Y.*, 2021 WL 5177363, at *8 (same result).

## I.       Remedy

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits

under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion;" (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful;" and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041,1045 (9th Cir. 2017).

Here, because there are outstanding issues that must be resolved prior to a disability determination, the Court remands the case for additional proceedings. Specifically, the case is remanded for the ALJ to:

> (1) explicitly consider E.M.'s special education, intensive home treatment, and regional center and/or vocational records pursuant to Social Security Ruling 11-2p, including but not limited to the opinions of Sarah Happel (Home for Little Wanderers), Hilary Pearlman (Safe at Home), and Director Harpreet Kaur (Adult Enrichment Services);
>
> (2) consider and ascribe the weight afforded to psychologist Dr. Kaely Shilakes' opinion;
>
> (3) reconsider and reweigh psychologist Dr. Lara San Pedro's opinion;
>
> (4) reconsider and reweigh E.M.'s testimony;
>
> (5) reconsider and reweigh E.M.'s brother's and sister's testimony;
>
> (6) reassess E.M.'s RFC in light of the proceedings on remand; and
>
> (7) reformulate the hypothetical posed to the VE as required by the additional proceedings.

## VI.   CONCLUSION

For the reasons discussed above, E.M.'s motion is GRANTED IN PART AND DENIED IN PART, the Commissioner's motion is GRANTED IN PART AND DENIED IN PART, and the Commissioner's final decision that E.M was not disabled is REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is instructed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated:  March 18, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge